UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

**MANMOHAN S. JAWA**

               Plaintiff,

        v.                                        5:97-CV-1346 (HGM)

**ROME DEVELOPMENTAL DISABILITIES
SERVICES** (name changed to Central New York
Developmental Services Office, branch of New York
State Office of Mental Retardation and Developmental
Disabilities (OMRDD))**, THOMAS MAUL, PHILIP
CATCHPOLE, ARTHUR HOLMBERG,
GEORGE SCHLOTTERER, TONI VERKRUYSSE,
MARY HALL-KATZ, ANTHONY LABATE,**

               Defendants.

_____

**APPEARANCES:**                        **OF COUNSEL:**

GALVIN & MORGAN                MADELINE SHEILA GALVIN, ESQ.
Attorneys for Plaintiff              JAMES E. MORGAN, ESQ.
217 Delaware Avenue            JEREMY P. CHEN, ESQ.
Delmar, New York 12054

HON. ELLIOT SPITZER            DAVID L. FRUCHTER
NEW YORK STATE ATTORNEY GENERAL    Assistant Attorney General
Attorneys for Defendants           KAREN MARCOUX MANKES
Office of the Attorney General        Assistant Attorney General
The Capitol
Albany, New York 12224-0341

**HOWARD G. MUNSON**
**Senior United States District Judge**

## MEMORANDUM - DECISION AND ORDER

    In his Second Amended Complaint,[1] Plaintiff, Manmohan S. Jawa, seeks damages under

_____

[1]The court is in possession of Plaintiff's original Second Amended Complaint, file-stamped in Albany, New York on April 9, 2002.  The Second Amended Complaint, however, was inadvertently entered as a certificate of service for the Second Amended Complaint.  *See* Dkt. No. 108.  The court deems the Second Amended Complaint filed and received effective April 9, 2002, and shall cite it as Dkt. No. 108.

fourteen causes of action pursuant to the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981, 1983 (equal protection, First Amendment retaliation and due process), 1985(3), 12112, 2112, Titles I and II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 2000e-5(f)(1) and (3), ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 626 ("ADEA"), Title I of the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3, 42 U.S.C. § 1981a, and the common law tort of defamation against Rome Developmental Disabilities Services/Central New York Developmental Services Office, branch of New York State Office of Mental Retardation and Developmental Disabilities ("Rome DDSO" and/or "OMRDD"), Thomas Maul, Philip Catchpole, Arthur Holmberg, George Schlotterer, Toni Verkruysse, Mary Hall-Katz, and Anthony LaBate (collectively "Defendants") alleging a host of civil rights discriminatory and retaliatory civil rights violations based upon plaintiff's age, sex, race, and religion.  Plaintiff sets forth two additional claims pertaining to the Public Employees Federation ("PEF") contract: one involving Article 13 relating to workers' compensation union benefits, and the other involving Article 20 relating to the maintenance of his employment file.  Dkt. No. 151, Trial Tr. at 497.  Plaintiff's case came before the court at a bench trial held on October 19 and October 22, 2004, November 15 and November 17, 2004, and January 10 and January 11, 2005.  At the close of Plaintiff's direct case, Plaintiff renewed his motion in limine and oral motion regarding his position that the workers' compensation decision matter which the Court denied.  Dkt. No. 152, Trial Tr. at 561.  At the close of Plaintiff's direct case, Defendants moved pursuant to Rule 52(c) of the Federal Rules of Civil Procedure that the court enter judgment as a matter of law against Plaintiff.  The court reserved on Defendants' motion and adjourned the trial pending its determination of that motion.  This Memorandum - Decision and Order sets forth the court's findings of fact and conclusions of law pursuant to Rule 52(c).

**DISCUSSION**

### I.   Defendants' Rule 52(c) Motion

Rule 52(c) provides, in pertinent part:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

FED.R.CIV.P. 52(c).  A Rule 52(c) motion made by a defendant may be granted "where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim." Stokes v. Perry, 1997 WL 782131, at * (S.D.N.Y. Dec. 19, 1997) (citing Wright & Miller, Federal Practice and Procedure, § 2573.1; *see* FED.R.CIV.P. 52(c) Advisory Committee's note; Burger v. New York Institute of Technology, 94 F.2d 830, 835 (2d Cir. 1996).  Unlike Rule 50, which governs judgment as a matter of law in jury trials, under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party, nor is the court to "draw any special inferences in the non-movant's favor."   In re Regency Holdings, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998) (collecting cases).  Rather, "the court acts as both judge and jury," id., and "is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies."  Desiderio v. Celebrity Cruise Lines, Inc., 1999 WL 440775, at *19 (S.D.N.Y. June 28, 1999); *see* Stokes v. Perry, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19, 1997).  A judgment pursuant to Rule 52(c) "operates as a decision on the merits in favor of the moving party."  *See* Regency, 216 B.R. at 375 (Bankr. S.D.N.Y. 1988).  Rule 52 directs trial courts to specify the findings of fact that support their conclusions of law.  Soc'y for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1088 (2d Cir. 1990); Inverness Corp. v. Whitehall Labs., 819 F.2d 48, 50 (2d Cir. 1987) (specific findings of fact are necessary to afford the reviewing court a "clear understanding of the ground or basis of decision") (citation omitted).

## II.    Findings of Fact/Plaintiff's Theory of the Case

Plaintiff is a Dravidian male who is a practicing Sikh and currently lives in Hope Mills, North Carolina.  *See* Dkt. No. 141, Trial Tr.at 3, 38.  Plaintiff was born in Patalia, India on January 8, 1929.  Plaintiff earned Bachelor and Master of Arts Degrees from the University of Punjab, India in the mid-1950s and earned his Ph.D. in psychology from the University of Oregon in 1968. Plaintiff's professional career included experience as a teacher, principal, and superintendent of schools, in India, East Africa, England and Canada.  *See* Dkt. No. 141, Trial Tr. at 5.  Plaintiff was also employed as the chief research psychologist at the Children's Hospital in Buffalo, New York. Id. at 6.  Plaintiff is not currently employed.

Plaintiff applied for a psychologist position with the Rome Developmental Disabilities Services Office ("Rome DDSO").  Dr. Joseph Szempruch, the chief psychologist at Rome DDSO, contacted Plaintiff and arranged an interview.   Dr. Szempruch, Mary Hall-Katz and Andy Verkruysse interviewed Plaintiff, and they discussed, *inter alia*, job duties/performance evaluations and job security/State PEF contract.  Id. at 7-14.  Rome DDSO hired Plaintiff effective August 31, 1989, as a Grade-23 Psychologist II.   Defendants assert that Rome DDSO hired Plaintiff as a "provisional" employee because there was no eligibility list for the Psychologist II position despite the great need for qualified individuals to fill such positions.  Given his provisional designation, Plaintiff could only obtain status as a permanent employee by passing the Civil Service test.  Dkt. No. 127, Defs.' Mem. of Law at 1.  Plaintiff, however, asserts that Rome DDSO never told him that his employment was probationary or provisional until after his termination. Dkt. No. 141, Trial Tr. at 21-22.  Rome DDSO assigned Plaintiff to work in its Eastern Oneida County unit headed by treatment team leader Hall-Katz.  The Psychologist-II position required Plaintiff to act as a clinical psychologist and provide psychological, functional and behavioral evaluations of Rome DDSO "consumers" with developmental disabilities.   Other duties included, *inter alia*, the design,

preparation, training and monitoring of Behavior Management Plans for the consumers included in his caseload.  Dkt. No. 127, Defs.' Mem. of Law at 1-2.

 At the beginning of his employment, Plaintiff felt that he was well-received by other Rome DDSO employees, but his perception changed about three months into his employment.  Plaintiff claims that Hall-Katz made unwelcome social invitations, asking him to accompany her to the theater and bars.  Dkt. No. 141, Trial Tr. at 28-29.  Plaintiff declined all such offers.  Id. at 31.  At trial, Plaintiff described overtly sexual conversations between several female employees, including Hall-Katz, at the Rome DDSO's Utica office.  Plaintiff testified that he was not comfortable with either the social invitations or with being privy to such conversations because, in adherence with the tenets of his religion, he does not drink, smoke or commit adultery.  Id. at 29-30.  Plaintiff testified that after he declined invitations to go the bars, Hall-Katz and the direct care staff began to insult him and berate him for others' failures.  Plaintiff inferred that his race and religion caused Hall-Katz and the direct care staff to pick on him and treat him rudely.  Dkt. No. 141, Trial Tr. at 31-34.  Plaintiff testified that Hall-Katz directed coarse language at him: "fuck you this, fuck, fuck."  Id. at 37. Approximately four months into his employment and concerned with his job security and his co-workers' conduct, Plaintiff met with Dr. Szempruch to discuss such matters and to request a transfer.  Dkt. No. 141, Trial Tr. at 31-32, 37.  Plaintiff told Dr. Szempruch that Hall-Katz was interested in sex and drinking and that she had not written the performance evaluation program.  A performance evaluation program is mandated by the State of New York and, as the name implies, evaluates an individual's performance as to the quality of his or her work in terms of the position's tasks and objectives.  Dkt. No. 141, Trial Tr. at 41-42.  Dr. Szempurch said he would transfer Plaintiff to the Rome DDSO's Lowville office.  Id. at 37.  According to Plaintiff, when Hall-Katz discovered Plaintiff's impending transfer, she became enraged.  Hall-Katz gave Plaintiff a notice of deficiency because he had not completed certain behavior modification plans.  Id. at 37-38, 40.

According to Plaintiff, Hall-Katz required him to prepare monitoring notes, a task she did not require of psychologists of her own race. On Plaintiff's last day at the Rome DDSO's Utica office, Plaintiff went to see Hall-Katz in her office where he noted that he had cleared eight month's backlog and asked if he could leave. Plaintiff asserts that Hall-Katz's answer was "fuck you, gray-bearded Indian. Your transfer cannot save you. I'll be after you." Id. at 37-38. Plaintiff verbally reported the incident to Dr. Szempruch and wrote a letter to Mr. Catchpole describing the same. Id. at 50. Plaintiff testified that this was the only comment made by Hall-Katz to him in which she referenced his race or ethnic origin derogatorily. Dkt. No. 138, Trial Tr. at 143-144. When Plaintiff left Rome DDSO Utica unit for the Lowville unit, he expected no further problems. Plaintiff belatedly received an "unsatisfactory" written performance evaluation from Hall-Katz. *See* Dkt. No. 141, Trial Tr. at 54; Pl.'s Ex. 20. Plaintiff alleges that the March 12, 1990 evaluation was an immediate consequence and retaliation for declining Hall-Katz' inappropriate sexual harassment and was based upon the personal feelings that Defendants had about Plaintiff due to his race, national origin, and age. Plaintiff believes Hall-Katz' intent was to have him wrongfully terminated. Dkt. No. 126, Pl.'s Trial, Brief at 2-3.

When Plaintiff began his duties at Lowville in March of 1990, he asked his supervisor, treatment team leader Robert Lecher, to write the performance evaluation program including a job description and performance requirements, but he did not receive one. For the first week to ten days of his employment, Plaintiff believed that he was well-received. After this brief reprieve, however, Plaintiff testified that Lecher began to treat him differently, which he attributes to Hall-Katz having contacted Lecher. Plaintiff testified that after Hall-Katz's alleged contact with Lecher, his non-verbal behavior changed such that Plaintiff perceived that he was being snubbed and unfairly reprimanded. Dkt. No. 141, Trial Tr. at 53-66. Plaintiff contends that Robert Lecher discriminated against Plaintiff by requiring him to complete six months of back logged work without compensation

for overtime hours.  Plaintiff claims that Defendants Hall-Katz, Schlotterer, and Catchpole conspired against him.  Dkt. No. 126, Pl.'s Trial, Brief at 3.

In or about 1991, Plaintiff sat for a civil service exam related to his employment, and in the application for said exam, requested an accommodation for his physical disability: Plaintiff sustained an injury to his arm and experienced difficulty in handwriting.  Plaintiff alleges that without notice, either the OMRDD or its agents communicated with the Civil Service examiners and caused them to wrongfully deny Plaintiff's request for an accommodation for his alleged disability, and further denied Plaintiff any opportunity to be heard or to present evidence on the matter.  As a result of Defendants' and co-employees' alleged wrongful acts, Plaintiff was unable to successfully complete the exam, and received a much lower grade thereon than he was capable of achieving, adding further discrimination to the relationship between the parties.  Dkt. No. 126, Pl.'s Trial, Brief at 6-7. Plaintiff sat for the Psychologist II civil service examination.  The court finds that Plaintiff noted on his application that he had difficulty writing, *see* Pl.'s Ex. 63, and that he never inquired further as to an accomodation nor was he ever contacted by anyone regarding an accommodation for disability.  Plaintiff testified that everyone with whom he worked knew of his disability; nevertheless, Plaintiff did not receive any accommodation.  Dkt. No. 138, Trial Tr. at 36- 42.

Plaintiff testified that someone uttered the phrase "turbaned monkey" in reference to him. Although Plaintiff suspects that either Dr. Schlotterer or Arthur Holmberg made the remark, he was unable to specifically identify who made the remark.  Dkt. No. 138, Trial Tr. at 145-147.  Plaintiff also contends that Holmberg, Scholotterer, and Toni Verkruysse, singled him out and subjected Plaintiff to continual emotional and psychological harassment.  Dkt. No. 126, Pl.'s Trial Brief at 3.

Plaintiff testified that the "gray bearded Indian" and "turbaned monkey" comments were the only two derogatory statements made in reference to his race or ethnic origin during his entire employment at Rome DDSO.  Dkt. No. 139, Trial Tr. at 4.  Plaintiff testified that he interpreted

Hall-Katz's invitations to social settings as sexual overtures.  Plaintiff testified that he overheard women discussing their sexual relations and that Hall-Katz found her husband at a bar.  Based upon these observations, Plaintiff testified that he was convinced that Hall-Katz desired a sexual relationship with him.  Id. at 5-7.  Plaintiff testified that Hall-Katz, Toni Verkruysse, Holmberg, Lecher, Szempruch, Labate, Schlotterer, and Catchpole, all conspired against him.  Dkt. No. 139, Trial Tr. at 28-31, 37.  Toni Verkruysse urged Plaintiff to contact Johnny Davis, the affirmative action officer of RDDSO to register his complaints that he was terrorized, oppressed and traumatized.  Id. at 42.

Plaintiff's counsel also argued that defendants targeted Plaintiff due to his cultural heritage and cited Defendant's Exhibit 10, a memo from Lisa O'Bryan to LaBate in which she opined that Plaintiff "utilized his cultural heritage to manipulate others and avoid responsibility."  Defs.' Ex. 10.  The court finds this statement rather unremarkable.  At trial, Plaintiff was unable to articulate any proof or evidence, beyond mere speculation, of a conspiracy against him.  *See* Dkt. No. 142, at 76-77.

Following the chain of command, Plaintiff met with Catchpole, the Director of Rome DDSO, to discuss his filing of a complaint with the Division of Human Rights regarding Hall-Katz. Catchpole told Plaintiff that he did not approve of Hall-Katz's language, that he would discipline her and would transfer him to the quality assurance unit to help alleviate his 120 mile round trip commute to Lowville.  As a result of this second transfer effective June 1990, Plaintiff worked under Dr. Szempruch in the quality assurance unit.  *See* Dkt. No. 141, Trial Tr. at 67-71.  Within two weeks of Plaintiff beginning his employment at the quality assurance unit, Dr. Szempruch wrote a performance evaluation program which specified Plaintiff's duties and noted that Plaintiff may be called upon to serve as a psychologist in a different unit but that Dr. Szempruch would remain his supervisor.  Plaintiff was employed at the quality assurance unit for nine months and described in

most favorable terms its working environment, noting the absence of offensive language and that he never received any reprimands.  Id. at 73-75.  In late March of 1991, Rome DDSO, however, subsequently transferred Plaintiff to the Western Oneida County I Unit under the supervision of Holmberg, a developmental disability specialist, treatment team leader Toni Verkruysse and Scholotterer, a Psychologist II.  Plaintiff testified that he was met with extreme hostility upon his arrival at the new unit with Schlotterer shouting at him.  Id. at 76-82.  Rome DDSO terminated Plaintiff's employment on June 10, 1991, effective June 14, 1991.

Plaintiff testified that he consulted with a physician who "prescribed" workers' compensation as of June 10, 1991, for the mental injuries allegedly inflicted upon him by the Holmberg unit.  *See* Pl.'s Ex. 76.  Plaintiff sent the doctor's prescription by certified mail to either Holmberg or Anthony Labate, Director of Human Resources Management.  Plaintiff testified that he had body aches, dizziness, headaches, sleeplessness, digestive problems, and a number of physical and mental problems.  Plaintiff testified that the doctor referred him to a psychiatrist, Dr. Sangani, who gave him samples of some medications.  *See* Dkt. No. 138, Trial Tr. at 5-10.  As of June 10, 1991, Plaintiff did not have health insurance.  Id. at 10.  Shortly after his termination on June 14, 1991, Dkt. No. 151, Trial Tr. at 542, Plaintiff testified that he entered a catatonic state, which prevented him from applying for unemployment insurance for three to six months.  Dkt. No. 138, Trial Tr. at 11-12.  At some time, Plaintiff applied for and received unemployment insurance for six months.  Id. at 12.  Plaintiff also obtained health insurance post-termination, which helped pay for his psychiatric treatment, although there was a high deductible.  Id. at 14.  Plaintiff also applied for workers' compensation.  Rome DDSO contested Plaintiff's workers' compensation application.  After three to five years, a hearing was held  where Plaintiff was awarded workers' compensation–but not as against Rome DDSO–which he continues to receive to this day.  Id. at 17-18.  Plaintiff also filed a complaint against Rome DDSO with the New York State Division of Human Rights ("DHR") and

Equal Employment Opportunity Commission in January 1992. Id. at 18-19. Plaintiff then filed his complaint in federal court in 1997. Id. at 21. Within six months of his termination but before his federal court filing, Plaintiff applied for various psychology and teaching-related positions. Id. at 21-24.

Plaintiff never filed any grievances while employed by OMRDD, but shortly after his termination, Plaintiff filed three grievances. Dkt. No. 151, Trial Tr. at 499. Plaintiff filed his first grievance on June 27, 1991, in which he complained that the DDSO violated Article 36.2, Subsection 2 of the PEF contract. Article 36.2 is a statement of nondiscrimination unrelated to either Article 13, workers' compensation or Article 20, maintenance of employees' personal history folders. Id. at 500-01. Plaintiff filed his second grievance July 17, 1991, in which he alleged that he was not aware that his civil service status was provisional or the implications thereof. Notably, however, the grievance did not pertain to either Articles 13 or 20 of the PEF contract. Id. at 503-04. Plaintiff filed his third grievance in 1993, which the director of employee relations for the OMRDD, Sheldon Cramer, rejected as untimely, *i.e.*, not filed within thirty days. Id. at 504-05. In his response to Plaintiff's letter, Cramer also noted that "[i]t appears that the content of this grievance seems to concern a decision by the Workers' Compensation Board" and that Plaintiff should direct any concerns to the State Insurance Fund or the Workers' Compensation Board." Dkt. No. 151, Trial Tr. at 505.

Anthony Labate testified that Plaintiff sent by certified mail a letter regarding his application for workers' compensation effective June 10, 1991, dated June 12, 1991. Dkt. No. 148, Trial Tr. at 407-09. Labate also testified that Plaintiff completed an employee accident report dated June 21, 1991, in which he applied for workers' compensation benefits. Labate testified that "[t]his was the notice to us that the employee . . . is claiming workers' comp." Dkt. No. 151, Trial Tr. at 463-64. The report contains a "statement of employee" which stated the supervisor started subjecting me to

psychological injury on or about April 1, 1991, and continued on June 10, 1991.  During this period

of time, Plaintiff's supervisor was Schlotterer and notably not Hall-Katz, Lecher, or Szempruch.

Id. at 464-65.

Plaintiff alleges that Defendant Thomas Maul, Commissioner of OMRDD, his predecessor,

and the supervisors at Rome DDSO failed to exercise their authority and declined the opportunity

they had to investigate, stop and/or rectify the alleged racial discrimination and harassing behavior

by the other Defendants and co-employees.  Plaintiff alleges that the OMRDD and/or Rome DDSO

terminated his employment in retaliation for his opposition to the alleged discrimination.  Plaintiff

contends that he suffered adverse employment consequences in the form of loss of pay and benefits,

as well as emotional harm and damage to his professional reputation.  *See* Dkt. No. 126, Pl.'s Trial

Brief at 4.  Plaintiff alleges that OMRDD terminated Plaintiff's employment on fabricated charges

of incompetency, but has not terminated professionally/ethically incompetent employees who are

of the Caucasian race.  In addition, Plaintiff alleges that the individual Defendants fabricated

documents between April and June of 1991 in an attempt to make Plaintiff appear incompetent.  *See*

Dkt. No. 126, Pl.'s Trial Brief at 5.  Plaintiff maintains that Defendants either fabricated or altered

documents, in violation of the PEF Contract Article 20 § 1 in order to produce a pretext for

terminating plaintiff.  Similarly, Plaintiff contends that Defendants fabricated and falsified evidence

of the service of a letter of termination addressed to Plaintiff and dated June 10, 1991, to purportedly

show that the letter was served upon his wife at his residence.  Id. at 7.

## III.     Conclusions of Law

### A.     *Plaintiff's Claims Pursuant to 42 U.S.C. §§ 1981, 1983 and 1985*

#### 1.     Eleventh Amendment

Plaintiff has brought claims against the OMRDD, an agency of the State of New York, *see*

N.Y. Mental Hyg. Law § 13.01 (McKinney 2002), the Rome DDSO, a regional service office

within the OMRDD, *see* id. at § 1321(a), and various individual defendants in their official capacities.  Although Plaintiff asserts to the contrary, at the bench trial the court did not discern continuous or ongoing Constitutional violations.  The Eleventh Amendment to the United States Constitution states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity.  Huang v. Johnson, 251 F.3d 65, 69 (2d Cir.2000).  The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "'real, substantial party in interest.'"  Id. at 69-70 (citing Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc., 506 U.S. 139, 142-47 (1993) and quoting Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 101-02 (1984)); Kentucky v. Graham, 473 U.S. 159, 169 (1985); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.2003) (holding that the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities."); Estes-El v. Town of Indian Lake, 954 F.Supp. 527 (N.D.N.Y. 1997) (explaining that the Eleventh Amendment barred arrestee's suit seeking monetary damages under §§ 1983 and 1985(3)).  Because New York has not waived its immunity for official-capacity § 1983 and § 1985(3) claims, and because Congress has not purported to abrogate state immunity in § 1983 and § 1985(3) suits, *see* Will v. Mich. Dept. of State Police, 491 U.S. 58, 65-66 (1989) (holding that the State and its agencies are not "persons" within the meaning of § 1983), both the state and the individual Defendants in their official capacities are immune from suit under § 1983 and Plaintiff's claims pursuant to §§ 1983 and 1985(3) fail.   Similarly, § 1981 does not abrogate a State's Eleventh Amendment immunity, *see* Cooper v. New York State Dept. of Mental Health, 2001 WL 456348, at *2 (S.D.N.Y. May 1, 2001) (citing Chinn v. City University, 963 F.Supp. 218, 224 & n. 1

(E.D.N.Y.1997)), and thus Plaintiff's claim pursuant to § 1981 fails.

Additionally, in Pennhurst State Scho. & Hosp. v. Halderman, 465 U.S. 89 (1984), the Supreme Court held that a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law . . . [and] conflicts directly with the principles of federalism that underlie the Eleventh Amendment." Id. at 106. Therefore, Plaintiff's state law claims against OMRDD, Rome DDSO and the individual Defendants in their official capacity also fail as a matter of law.

2.    Statute of Limitations

Plaintiff alleges that Defendants violated his civil rights during the period of his employment with Rome DDSO. Plaintiff's employment was terminated from Rome DDSO on June 14, 1991. Plaintiff commenced this action on September 16, 1997.   In § 1983 actions, the applicable limitations period is found in the general or state statute of limitations for personal injury actions. Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.1997) (quoting Owens v. Okure, 488 U.S. 235, 249-50 (1989)). Accordingly, New York's three-year statute of limitations for "unspecified personal injury actions," New York Civil Practice Law and Rules § 214(5), governs § 1983 actions in New York. Id.  Section 214(5) provides that an action to recover for personal injury must be brought within three years of the date of its accrual.  See id.  Similarly, the applicable statute of limitations for actions under § 1985 is three years, see Paige v. Police Dept. of City of Schenectady, 264 F.3d 197, 199 n. 2 (2d Cir. 2001), while the statute of limitations for a § 1981 claim is four years.  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004).  The date on which an action accrues is governed by federal law, see Ormiston, 117 F.3d at 71, which provides that an action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir.2002), cert. denied, 538 U.S. 922, 123 S.Ct. 1574, 155 L.Ed.2d 313 (2003).  There is no question that the conduct of which Plaintiff complains occurred

more than six years prior to his filing the complaint. The timeliness of Plaintiff's claims, therefore, depends upon whether the "continuing violation doctrine" applies to this case.

The continuing violation doctrine "allows a plaintiff in certain circumstances to recover on the basis of an ongoing policy or practice of illegal activity initiated prior to the limitations period." Pollis v. New School for Soc. Research, 132 F.3d 115, 118 (2d Cir.1997) (citing Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). This doctrine arose from Title VII actions, and courts most often apply it in cases involving specific discriminatory employment policies or mechanisms, "such as discriminatory seniority lists . . . or discriminatory employment tests." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). The Second Circuit, however, has applied the doctrine in cases brought pursuant to § 1983. *See* Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994). Nonetheless, "courts in the Second Circuit have viewed continuing violation arguments with disfavor," Garland-Sash v. City of New York, 2005 WL 2133592, at *4 (E.D.N.Y. Sept. 1, 2005) (citing Curtis v. Airborne Freight Corp., 87 F.Supp.2d 234, 244 (S.D.N.Y.2000)), and "only compelling circumstances will warrant application of the exception to the statute of limitations." Quadrozzi Concrete Corp. v. City of New York, 2004 WL 2222164, at *8 (S.D.N.Y. Sept. 30, 2004) (citation and internal quotation omitted).

"In order to assert a continuing violation, a plaintiff must establish both (1) a policy or practice which caused the alleged discrimination, and (2) that the timely claim is continuous in time with the untimely claims." Plumey v. New York State, 389 F.Supp.2d 491, 498 (S.D.N.Y. 2005) (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir.1998)). With respect to the first element, "[t]he law is clear that the continuing violation exception applies only where there are 'specific' or 'identifiable' discriminatory customs or practices, or specific and related acts that are tantamount to such customs or policies." Weeks v. New York State (Div. of Parole), 273 F.3d 76,

82-83 (2d Cir.2001). In other words, "what must be alleged to withstand dismissal on the pleadings . . . is a discriminatory policy or practice, not the undertaking to come up with one." Id. at 83. A complaint which alleges only "discrete discriminatory acts" is insufficient to invoke the continuing violations doctrine; such acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Lambert v. Genesee Hosp.,10 F.3d 46, 53 (2d Cir. 1993) ("[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."). As noted above, the Court did not discern an ongoing violation at the bench trial and finds no evidence of a policy or practice which caused the alleged discrimination.

Plaintiff contends that the statute of limitations was automatically tolled when he filed his complaint with the DHR in January 1992. Plaintiff notes that he received his right to sue letter on August 4, 1997 and filed his original complaint in this Court on September 17, 1997. *See* Dkt. No. 130, Pl.'s Brief at 8. "The Supreme Court has instructed that in section 1983 actions, we borrow not only a state's limitations period but also its 'tolling rules' . . . unless applying the state's tolling rules 'would defeat the goals of the federal statute at issue'." Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir.2002) (quoting Board of Regents v. Tomanio, 446 U.S. 478, 484-86, 100 S.Ct. 1790, 64 L.Ed.2d 440, and Hardin v. Straub, 490 U.S. 536, 539, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989)); Jewell v. County of Nassau, 917 F.2d 738, 740 (2d Cir.1990) (explaining that in § 1983 actions in New York "federal courts [are] obligated . . . to apply the New York rule for tolling [the] statute of limitations."(citation and internal quotations omitted)). Plaintiff argues that his § 1981, § 1983 and § 1985 claims were filed in a timely manner because the statute of limitations was tolled when he filed his complaint with the DHR and cites to Pan American World Airways, Inc. v. New York State Human Rights Appeal Bd., 475 N.Y.S.2d 256 (1984) in support of that contention. *See* Dkt.

No. 130, Pl.'s Brief at 7; Dkt. No. 152, Trial Tr. at 583.  Upon the filing of a complaint with the

DHR, a party is statutorily prohibited from filing an action in Court based on the same claims. Pan

American World Airways, Inc., 475 N.Y.S.2d 256; *see* 9 N.Y. EXEC. LAW § 297 and N.Y. C.P.L.R.

§ 204.  The law, however, "is clear that the pursuit of Title VII administrative remedies does not toll

the statute of limitations on other Civil Rights Act claims." Szarejko v. Great Neck School District,

795 F.Supp. 81, 83 (E.D.N.Y.1992) (citing Weise v. Syracuse University, 522 F.2d 397, 408 n. 15

(2d Cir.1975); Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 455, 95 S.Ct. 1716, 1717,

44 L.Ed.2d 295 (1975) (holding that the filing of an administrative charge under Title VII does not

toll the limitations period on a claim under 42 U.S.C. § 1981 arising out of the same discriminatory

conduct)).  The "Second Circuit has indicated that the proper way for plaintiffs to proceed in such

a scenario is to file suit on the § 1983 claim, and then later amend the complaint after the outcome

of the administrative proceedings." Branch v. Guilderland Cent. School Dist., 239 F.Supp.2d 242,

251 (N.D.N.Y. 2003) (citing Carrero v. New York City Hous. Auth., 890 F.2d 569, 576 (2d

Cir.1989)).  New York only provides for tolling in limited circumstances[2], and the filing of a

complaint with the DHR is not among them.  Accordingly, the Court concludes that Plaintiff's

claims under §§ 1981, 1983 and 1985 are jurisdictionally and time barred and dismisses them.

  B.  *Plaintiff's Defamation Claim*

    Defendants argue that Plaintiff's defamation claim too is untimely due to the one year statute

of limitations for intentional torts.  *See* N.Y. C.P.L.R. § 215(3).  "For the purpose of computing the

running of the one year statute of limitations [for defamation], the causes of action accrue on the day

the statements were made." Vasile v. Dean Witter Reynolds, Inc., 20 F. Supp 2d 465, 495 (E.D.N.Y.

---

   [2]N.Y. C.P.L.R. provides for tolling in the following circumstances: where an action is stayed by court order, §
204(a); where the defendant is out of state when the claim accrues, § 207; in the case of infancy or insanity, § 208; or,
under principles of equity, when a court estops the defendant's assertion of a statute of limitations defense due to the
defendant's misconduct. Jewell, 917 F.2d at 741 n. 1.

1998).  Plaintiff argues that the one year statute of limitations was tolled during the pendency of Plaintiff's complaint before the DHR.  The Court disagrees.  While the pendency of Plaintiff's DHR complaint precluded Plaintiff from initiating a lawsuit based on ADA or ADEA claims, it did not prevent him from filing an action for defamation.  Hofmann v. District Council 37, American Federation of State, County, 2002 WL 31045858, at *2 (S.D.N.Y. May 9, 2002); *see also* Oshinsky v. New York City Housing Authority, No. 98 Civ. 5467, 2000 WL 1225796, at *7 (S.D.N.Y. Aug. 28, 2000) (filing claim with state DHR does not toll statute of limitations on tort claim); Katt v. New York City Police Department, No. 95 Civ. 8283, 1996 WL 744870, at *3-4 (S.D.N.Y. Dec. 31, 1996) (pending EEOC proceeding does not toll limitations period for state tort claims).  Therefore, the Court dismisses Plaintiff's defamation claim.

   C.  *Plaintiff's Claims For Violations of the PEF Contract*

   Plaintiff asserts two claims against Defendants for allegedly violating the contract between the State of New York and the PEF: one involving Article 13 relating to workers' compensation union benefits, and the other involving Article 20 relating to the maintenance of Plaintiff's employment file.  *See* Defs.' Exs. 52 and 53.  Article 34 of the 1988-91 and 1991-95 agreements between the State of New York and the PEF governs the resolution of disputes involving the interpretation, application or claimed violations of a specific term or provision of the Agreement.  Article 34 sets forth a three-step grievance procedure for the resolution of contract disputes.  *See* Defs.' Ex. 53.  Plaintiff contends that he followed the grievance procedure with respect to his three grievances and pursued them to the second step.  Plaintiff, submits, however, that the PEF dropped the grievances at the second step because of Plaintiff's discharge.  *See* Dkt. No. 130, Pl.'s Brief. Plaintiff and his union failed to exhaust his remedies under the agreement, *i.e.*, they did not pursue his grievances beyond step two, despite the availability of at least one further step or appeal, *see* Defs.' 53, Article 34.4(c) and (d), and thus failed to exhaust his administrative remedies.

Furthermore, as explained in <u>Arizaga v. New York City Health and Hospitals Corp.</u>:

> the law is settled that where a collective bargaining agreement authorizes arbitration between members of a union and the employer, the union represents all the employees as to all covered matters and each individual employee in becoming a beneficiary to the contract gives up to the union, as his representative, his individual right to sue on or litigate as to the contract.  In those instances in which the employee alleges that his union has breached its duty of fair representation, his only remedy is to bring suit against the union for breach of fiduciary duty.  In that connection, a mere neglect or refusal by the union to arbitrate a particular grievance does not, by itself, constitute a breach of duty.  Since petitioner has not demonstrated that the union either did not represent him adequately or did so wrongfully, petitioner has no direct cause of action against his employer.

96 A.D.2d 457, 457-58, 464 N.Y.S.2d 767, 769 (1st Dep't 1983) (internal citations and quotations omitted).  Plaintiff's PEF contract claims are not properly asserted here and the Court dismisses them.

>    D.    *Plaintiff's ADA Claim*

>       1.    Jurisdiction

In his first cause of action, Plaintiff alleges that upon notifying Defendants of his disabling condition, they commenced a pattern of intentional attacks against him and unfounded criticism of his work.  *See* Dkt. No. 108, Second Am. Compl. at ¶ 108.  Plaintiff alleges that defendants forced him to leave his employment due to a work-related compensable injury.  <u>Id.</u> at ¶¶ 114-117.  Plaintiff further alleges that defendants refused to accommodate his physical disability, which prevented him from having a fair and equal opportunity to complete the Civil Service Examination for the position of Psychologist II and continuing his employment in that capacity.  *See* Dkt. No. 108, Second Am. Compl. at ¶ 121.

In <u>Board of Trs. of Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Supreme Court held that states are immune from liability for money damages under Title I of the ADA.  <u>Id.</u> at 374; *see also* <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 288 (2d Cir. 2003).  Thus, to the extent Plaintiff seeks money damages under Title I of the ADA, his claim must be

dismissed.

In Garrett, the Court expressly left open the question of whether the Eleventh Amendment permits suits for money damages under Title II.  Id. at 360 n. 1.  In Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98 (2d Cir.2001), the Second Circuit held that a private plaintiff may bring suit against a state pursuant to Title II of the ADA for money damages only if the plaintiff can establish that the Title II violation was motivated by either "discriminatory animus or ill will based on the plaintiff's disability."  Garcia, 280 F.3d at 111.  If a plaintiff were to sue individuals in their official capacities for money damages, the Second Circuit has held that it would in fact be a suit against New York and therefore the Eleventh Amendment would shield the individuals to the same extent as it would shield New York.  Garcia, 280 F.3d at 107 (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)).  Garcia was the standard in the Second Circuit until May 17, 2004, when the Supreme Court decided Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).  In Lane, the Supreme Court considered whether Congress validly abrogated the Eleventh Amendment when enacting Title II of the ADA, specifically examining Title II within the context of a state's responsibility to provide disabled persons with access to courts.  Recognizing that the right of access to courts is fundamental, the Court held that Title II of the ADA validly abrogates state sovereign immunity with regard to this limited class of cases.  Lane, 541 U.S. at 533-34; see also Press v. S.U.N.Y. at Stony Brook, 388 F.Supp.2d 127, 133 (E.D.N.Y. 2005) (noting division in Second Circuit as to whether Lane only addressed the narrow issue of access to the courts and Garcia applies to all other Title II cases or whether in the wake of Lane, a private suit for damages under Title II may only be brought if plaintiff can establish violation of a fundamental right).  The Court need not address the Title II question, however, because the ADA does not apply retroactively.

2.      ADA Does Not Apply Retroactively

The ADA was enacted on July 26, 1990.  Title I of the ADA, governing employment, became effective on July 26, 1992.  *See* Pub.L. No. 101-336, § 108, 104 Stat. 327, 337 (1990) ("This title shall become effective 24 months after the date of enactment."); Smith v. United Parcel Serv. of Am., Inc., 65 F.3d 266, 266 (2d Cir.1995).  The ADA does not apply retroactively to acts occurring before the effective date.  *See* Smith, 65 F.3d at 266.  Title II of the ADA, governing public services, became effective eighteen months after enactment, on January 26, 1992.  *See* Pub.L. 101-336, § 231(a), 104 Stat. 327, 346 (1990) ("[T]his part shall become effective 18 months after the date of enactment of this Act.").  In the case at bar, all of the alleged events occurred prior to the effective date of the ADA and are time barred.  Therefore, the Court dismisses Plaintiff's ADA claim.

   E.   *Plaintiff's Age Discrimination Claim*

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  The class protected by this statutory prohibition is limited to persons forty years of age or older.  *See* id. at § 631.  Plaintiff, who was 61 years old at the time of his discharge and, therefore, a protected class within the meaning of the ADEA, asserts that defendants discriminated against him on the basis of his age when they terminated his employment and transferred his responsibilities to a substantially younger counterpart at OMRDD.  Defendants argue that the Court lacks subject matter jurisdiction over Plaintiff's ADEA claim.  Plaintiff largely dismisses Defendants' assertion arguing that "[i]t is basically too late in this stage of the game to claim that this Court lacks subject matter jurisdiction."  Dkt. No. 130, Pl.'s Brief at 8.  The question of whether a federal court has subject matter jurisdiction, however, "may be raised at any time by a party or by the court *sua sponte*."  Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 700 (2d Cir. 2000); Calderon v. Ashmus, 523 U.S. 740, 745 n. 2, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (stating that the Eleventh

Amendment is jurisdictional in that it limits a federal court's judicial power, and may be invoked at any stage of the proceedings) .

In Kimel v. Florida Bd. of Regents, 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) the Supreme Court considered whether states could be sued by their employees under the federal law against age discrimination and held that Congress exceeded its Fourteenth Amendment remedial powers by abrogating the states' immunity from suits brought under the ADEA.  In McGinty v. New York, 251 F.3d 84 (2d Cir. 2001), the Second Circuit explained that:

> Although Congress may, pursuant to its spending power, extract a constructive waiver of Eleventh Amendment immunity by placing conditions on the grant of funds to states, *see* College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (citing South Dakota v. Dole, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)), waiver based on participation in a federal program will be found only if stated in "'express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction,'" Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n, 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam) (alteration in original) (quoting Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

Id. at 95.  In other words, "mere participation by a state in a federal program providing financial assistance does not establish the state's consent to be sued in federal court."  Id. (citing Edelman, 415 U.S. at 673, 94 S.Ct. 1347).  Here, Plaintiff failed to identify under what statutes Defendants receive federal funding, or what Congress provided for in those statutes with respect to sovereign immunity, and thus the Court has "no way of ascertaining what Congress intended or whether the abrogation of immunity was expressed in 'unmistakably clear language.'" McGinty, 251 F.3d at 85 (quoting Welch v. Tex. Dep't of Highways & Pub. Transp., 483 U.S. 468, 478, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987)).  The Eleventh Amendment cloaks Rome DDSO and OMRDD with sovereign immunity and the Court dismisses Plaintiff's ADEA claim against them and the individual defendants in their official capacities.  As to the Defendants in their individual capacities, the District Courts within the Second Circuit have found that individuals cannot be held liable under the

ADEA.  *See*, *e.g.* Lennon v. NYC, 392 F.Supp.2d 630, 640 (S.D.N.Y. 2005); Parker v. Metropolitan

Transp. Auth., 97 F.Supp.2d 437, 452 (S.D.N.Y. 2000); McKeever v. New York Medical College,

1999 WL 179376, at *8 (S.D.N.Y. Mar. 31, 1999) (citing Smith v. Lomax, 45 F.3d 402, 403-04

(11th Cir. 1995); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir. 1994); Miller v.

Maxwell's Int'l Inc., 991 F.2d 583, 587-88 (9th Cir.1993)).   This Court agrees and dismisses

Plaintiff's ADEA claim against the Defendants in their individual capacities.

      F.    *Plaintiff's Title VII Claims*

      Plaintiff alleges that Rome DDSO terminated his employment because of, *inter alia*, his race,

sex and religion in violation of Title VII, 42 U.S.C. § 2000e-2.  *See* Dkt. No. 126, Pl.'s Trial Brief

at 9.  Title VII forbids employers from discriminating "against any individual with respect to . . .

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII encompasses the entire

spectrum of "disparate treatment . . . , which includes requiring people to work in a discriminatorily

hostile or abusive environment."   Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367,

370, 126 L.Ed.2d 295 (1993).  In Tomka v. Seiler Corp., the Second Circuit held that "an employer's

agent may not be held individually liable under Title VII."   66 F.3d 1295, 1317 (2d Cir. 1995);

Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir.2000).  Accordingly, the Court dismisses Plaintiff's

Title VII claim against the individual Defendants.

      Defendants argue that Plaintiff cannot recover under Title VII for any claims which occurred

more than 300 days before he filed his charge with the DHR/EEOC and the Court agrees.  A plaintiff

asserting a Title VII claim must satisfy an exhaustion requirement.  "A district court only has

jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on

conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC

charge." Butts v. City of New York Dept. of Housing, Preservation and Dev., 990 F.2d 1397, 1401

(2d Cir.1993) (quoting Stewart v. United States Immigration & Nat. Serv., 762 F.2d 193, 198 (2d

Cir.1985)). In order to file an action in federal court alleging discrimination under Title VII, a

plaintiff must first file a charge with the EEOC within 300 days after the allegedly discriminatory

act occurred. See 42 U.S.C. § 2000e-5(e); see also Zerilli-Edelglass v. New York City Transit

Auth., 333 F.3d 74, 76 (2d Cir.2003). Plaintiff filed his DHR charge on January 2, 1992, which is

within 300 days of his termination on June 10, 1991. Counting back 300 days includes

discriminatory acts occurring on and after March 8, 1991, and thus necessarily excludes

discriminatory acts that occurred prior to March 8, 1991. Therefore, the time period covered by

Plaintiff's DHR charge excludes Plaintiff's employment while under the supervision of Hall-Katz

and Lecher. As noted above, the "gray bearded Indian" and "turbaned monkey" comments, which

Plaintiff testified were only two derogatory statements made in reference to his race or ethnic origin

during his entire employment at Rome DDSO, occurred while Plaintiff was under the supervision

of Hall-Katz and Lecher. Therefore, those two comments are beyond the Court's consideration.

Similarly, Plaintiff's allegations of sexual harassment against Hall-Katz also fall outside the scope

of the Court's review.

Plaintiff argues that the alleged discriminatory acts were part of a continuing violation that

collectively led to his termination. As explained above, the Court does not share this view.

Plaintiff, however, directs the Court's attention to various documents that were generated after

March 8, 1991, in support of his Title VII claims. See Dkt. No. 152, Trial Tr. at 584 (referencing

Plaintiff's Exhibits 16, 21, 27, 31, 33, 34, 40, 42, 50, 66 and 70). Plaintiff asserts Title VII claims

for sexual, racial, religious and retaliatory discrimination.

1.    Sexual Discrimination

It is well established that two forms of sexual harassment violate Title VII's prohibitions against workplace inequality: (1) quid pro quo and (2) hostile work environment harassment. *See* Meritor Savings Bank v. Vinson, 477 U.S. 57, 64-65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir.1992). "The Second Circuit [, however,] has . . . clarified that there is no need to distinguish between 'hostile work environment' sexual harassment and 'quid pro quo' harassment." Yerry v. Pizza Hut of Southeast Kansas, 186 F.Supp.2d 178, 183 (N.D.N.Y. 2002). After Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001), "it is clear that allegations of 'quid pro quo' sexual harassment do not state an independent claim, but are instead merely one type of factual allegation to support a cause of action under Title VII." Id. Nonetheless, in order to establish a violation of Title VII by an employer under a theory of quid pro quo sexual harassment, "a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir.1994). A claim for hostile work environment sexual harassment is established under Title VII, when an individual's "workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citation and quotations omitted). The Court has reviewed the exhibits referenced by Plaintiff, in addition to other documents and testimony concerning the operative time period under the above standard and concludes that they do not provide any evidence of sexual discrimination.

2.      Racial Discrimination

Plaintiff's Title VII claim is analyzed under the familiar McDonnell Douglas Corp. v. Green,

411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting standard.  Under McDonnell, the burden is on Plaintiff to put forth a prima facie showing of discrimination.  *See*, *e.g.*, Ongsiako v. City of New York, 199 F.Supp.2d 180, 188 (S.D.N.Y. 2002).  If successful, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's discharge.  Id.  If defendant articulates such a reason, plaintiff must then demonstrate that defendant's claimed reason is untrue and is but a pretext for intentional, unlawful discrimination.  Ongsiako, 199 F.Supp.2d at 188.

To establish a prima facie case of racial or national origin discrimination, Plaintiff must show that: (1) he belongs to a protected class; (2) he was performing her duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination.  *See* McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.1997).  "Although a plaintiff's burden of establishing a prima facie case is *de minimis*, a Title VII plaintiff's claims nevertheless fail if she cannot make out a prima facie case of discrimination."  Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir.2004) (internal citations and quotations omitted).

Here, Plaintiff clearly satisfies prongs one and three: he is Dravidian and was discharged from his employment.  His claim, nonetheless, fails because at least some of the documents generated during the operative period, March 8, 1991 forward, and as referenced above, reveal unsatisfactory job performance, strained office relations with co-employees, and unresponsiveness to supervision.  Moreover, the documents do not reveal any animus toward Plaintiff's race or national origin.  The Court has reviewed the exhibits referenced by Plaintiff, in addition to other documents and testimony concerning the operative time period under the above standard and concludes that they do not provide any evidence of discrimination based upon Plaintiff's race or

national origin.

       3.       Religious Discrimination

The courts have applied the <u>Harris</u> standard to religious hostile work environment claims. <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d Cir.2004). In determining whether conduct in a workplace environment is hostile or abusive enough to constitute an actionable claim under Title VII, the court is to consider the totality of the circumstances. <u>Harris</u>, 510 U.S. at 23; <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 111 (2d Cir. 1997). Among the more important factors to be considered are: (1) the frequency of the discriminatory conduct (2) its severity (3) whether it is physically threatening or humiliating, or a mere offensive utterance and (4) whether it unreasonably interferes with the employee's work performance. <u>Harris</u>, 510 U.S. at 23. The religious hostility complained of must also be directed at the individual "because of such individual's . . . religion." 42 U.S .C. § 2000e-2(a)(1). An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes. <u>Brennan v. Metropolitan Opera Ass'n</u>, 192 F.3d 310, 318 (2d Cir. 1999).

The Court has reviewed the exhibits referenced by Plaintiff, in addition to other documents and testimony concerning the operative time period under the above standard and concludes that they do not provide any evidence of religious discrimination.

**CONCLUSION**

**WHEREFORE,** after careful consideration of the file in this matter including the parties'

submissions, the testimony elicited by the parties at the bench trial, and the applicable law, the court

hereby

**GRANTS** Defendants' motion pursuant to Rule 52 of the Federal Rules of Civil Procedure,

enters judgment as a matter of law against Plaintiff and **DISMISSES** Plaintiff's Second Amended

Complaint in its entirety.  The Clerk of the Court is directed to close the case.

**IT IS SO ORDERED.**

Dated March 31, 2006
Syracuse, New York

Howard G. Munson
Senior  U.S. District Judge